OPINION
Defendant-appellant Shawn Smith was arrested and charged with both the Aggravated Murder and the Felony Murder of Angela Dapice, his live-in girlfriend. Smith did not dispute having caused Dapice's death, by kicking her repeatedly. Smith's position, which he supported with his testimony, was that his offense was Voluntary Manslaughter, because he was provoked into a rage by Dapice's having taken his money and pointed a gun at him. There were no eyewitnesses to the killing other than Smith. Smith had given a statement to the police, after being apprehended, in which he did not mention that Dapice had pointed a gun at him.
In the middle of the trial, Smith moved to dismiss the indictment, contending that it was defective, because it did not specify the particular offense of violence that he allegedly was committing or attempting to commit, which resulted in Dapice's death. In responding to the motion, the State did not assert that this motion was not timely filed. The State contended that the indictment was sufficient, and also sought to amend the indictment to state that the underlying offense was Felonious Assault.
The trial court denied the motion to dismiss the indictment, without, however, finding that it was not timely filed. The trial court permitted the indictment to be amended, although noting that, in the trial court's opinion, the amendment was not necessary.
During the prosecutor's rebuttal argument, the prosecutor indicated that he did not believe Smith's testimony concerning the gun having been pointed at him. It is the position of Smith's appellate counsel, who was also one of Smith's trial counsel, that trial counsel interposed an objection to this remark. The transcript does not reflect any objection. Smith sought correction of the record, pursuant to App.R. 9(E). The court reporter submitted an affidavit in which she averred that she did not hear any objection. The trial judge denied the motion to correct the record, without a hearing, noting that he did not recall any objection having been interposed.
The jury returned a guilty verdict, a judgment of conviction was entered, and Smith was sentenced accordingly. From his conviction and sentence, Smith appeals.
 I
Smith's first assignment of error is as follows:
 "BECAUSE THE INDICTMENT FOR FELONY MURDER FAILED TO SPECIFY THE UNDERLYING OFFENSE THAT ALLEGEDLY CAUSED THE DEATH OF THE VICTIM, THE DEFENDANT'S RIGHT TO GRAND JURY PRESENTMENT AND CONSIDERATION AS GUARANTEED BY ARTICLE 4, SEC. 10 OF THE OHIO CONSTITUTION AND THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, THE DEFENDANT'S CONVICTION FOR MURDER MUST BE REVERSED."
Although the State now argues that Smith's motion to dismiss the indictment was not timely filed, pursuant to Crim.R. 12, the State made no argument to this effect in the trial court, and the trial court considered the merits of Smith's motion. Because Crim.R. 12(D) permits a trial court, "in the interest of justice," to extend the time for making pretrial motions, we deem the trial court effectively to have done so, without objection from the State.
Smith relies upon State v. Headley (1983), 6 Ohio St.3d 475, for the proposition that the indictment in the case before us was deficient. The State relies upon State v. Childs (2000), 88 Ohio St.3d 558, for the contrary proposition. The issue is not free from difficulty.
In State v. Headley, supra, an indictment for Trafficking in Drugs, in violation of R.C. 2925.03, was held to be deficient because it did not specify the name of the controlled substance, or drug, involved. As in the case before us, the defendant in Headley moved to dismiss the indictment, but the trial court denied the motion to dismiss, and granted the State's motion to amend the indictment to name the particular drug. The Ohio Supreme Court held that there are distinct offenses, depending upon the drug involved, so that the indictment could not be amended to name the drug, without running afoul of Crim.R. 7(D), which provides that an indictment may be amended so long as "no change is made in the name or identity of the crime charged." The Ohio Supreme Court reasoned as follows:
"In this case, appellee was charged under R.C. 2925.03, relating to trafficking in drugs. Generally, that statute prohibits the selling, distribution, production or possession of certain controlled substances, or drugs, for certain purposes. The severity of the offense is dependent upon the type of drug involved. Under R.C. 2925.03(C), the offense is aggravated trafficking if the substance involved is a Schedule I drug, with the exception of marijuana, or a Schedule II drug. Under R.C.2925.03(D), if the substance involved is a Schedule III, IV or V drug, the offense is the lesser one of trafficking in drugs.
"Under this analysis, it is evident that R.C. 2925.03 sets forth more than one criminal offense with the identity of each being determined by the type of controlled substance involved. As such, the type of controlled substance involved constitutes an essential element of the crime which must be included in the indictment. The omission of that information cannot be cured by amendment, as to do so would change the very identity of the offense charged." State v. Headley, supra, at 479.
In the case before us, by contrast, we are not dealing with different offenses having penalties of differing severity. Regardless of the particular mechanism by which the decedent's death is caused, the crime is Murder, punishable as provided for in R.C. 2929.02. In our view, then,State v. Headley, supra, is distinguishable.
In State v. Childs, supra, the defendant was charged with, among other things, a conspiracy to commit Aggravated Trafficking. The identity of the controlled substance that the defendant allegedly conspired to possess or distribute was not named in the indictment. The Ohio Supreme Court held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit. Id., at 565.
It should be noted that in State v. Childs, supra, the particular offense that the defendant was alleged to have conspired to commit was named in the indictment. For this reason it is not clear that State v.Childs controls the outcome of the case before us, as the State contends. The opinion in State v. Childs refers to the provision in Crim.R. 7(B) that an indictment "may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged." We glean from this reference that the general rule is that an indictment stating an offense in the words of the applicable section of the statute is sufficient.
As the State points out, the indictment in this case charges an offense in the words of the statute, R.C. 2903.02(B). The question, then, is whether greater specification is required in this instance; i.e., whether this should be an exception to the general rule that an indictment need only state an offense in the words of the statute proscribing the offense. As the State notes, any problem involving the sufficiency of notice to this defendant was cured by a bill of particulars that the State had provided, pursuant to Smith's request, in which it was alleged that Dapice's death was a result of Smith having kicked her with steel toed boots, which he used as a deadly weapon. The remaining issue is whether there is any likelihood that the grand jury may have returned an indictment based on an alleged set of facts different from the set of facts upon which the petit jury's guilty verdict was based. This was the subject of the concern expressed in State v. Vitale (1994),96 Ohio App.3d 695, in which an indictment for a theft alleged to have occurred on June 14, 1991, was amended to allege that the theft offense was committed from June 14 through June 21, 1991, inclusive, evidently to accommodate evidence that the theft occurred on June 21, 1991, not on the earlier date specified in the indictment. In holding that the trial court erred when it had permitted the amendment of the indictment, the court of appeals held that "the risk is squarely presented that Defendant was convicted of an offense that was never presented to the grand jury."State v. Vitale, supra, at 700.
In the case before us, unlike in State v. Vitale, supra, there does not appear to be any likelihood that the petit jury wound up considering an offense different than the offense considered by the grand jury. Dapice's killing occurred at a particular time and place, and, assuming the elements of the offense were proven, constituted the same offense of Felony Murder, regardless of the particular mechanism by which Dapice was killed.
Smith's first assignment of error is overruled.
 II
Smith's second, third and fourth assignments of error are as follows:
 "THE DEFENDANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL BECAUSE OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT."
 "THE APPELLANT WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 10 OF THE OHIO CONSTITUTION, WHEN THE TRIAL COURT REFUSED TO HOLD AN EVIDENTIARY HEARING ON WHETHER OR NOT TO CORRECT THE RECORD TO REFLECT AN OBJECTION TO IMPROPER STATEMENTS BY THE PROSECUTOR IN CLOSING ARGUMENTS."
 "THE APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL AS GUARANTEED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY HIS TRIAL COUNSEL'S FAILURE TO OBJECT TO THE IMPROPER STATEMENTS OF THE PROSECUTOR DURING CLOSING ARGUMENT."
Smith's appellate counsel, who was also one of his trial counsel, asserts that the prosecutor's comment to which these assignments of error relate was the subject of an objection at trial. The trial court ruled otherwise, however, when Smith attempted to correct the record, pursuant to App.R. 9(E), to reflect that an objection had been made. The procedural issues Smith is raising concerning the denial of his motion to correct the record, without a hearing, are interesting, but we find it unnecessary to resolve them. We are prepared to assume, for purposes of analysis, that there was a timely objection to the prosecutor's remark. Nevertheless, we are not persuaded that the remark constituted reversible prosecutorial misconduct.
Smith testified in his own defense. He admitted kicking Dapice to death. He claimed that he did so only after he became enraged as a result of Dapice's having taken his money from a drawer, and having pointed a gun at him. Smith argued that he should be found guilty of Voluntary Manslaughter, not Felony Murder.
In his initial closing argument, the prosecutor made a forceful, but fair, argument that the jury should not believe Smith's testimony that Dapice had threatened him with a gun. That argument included the following:
 "And I think the most chilling thing or the most surprising thing to me is after all is said and done and Mr. Smith is caught in Cleveland, Ohio, by the Fugitive Squad hiding in a closet and begins to want to talk about this homicide, about this killing and what he did to Miss Dapice, in all the admissions he makes about why it happened, how it happened, about guns and scales that were taken, about things that Angela did, he never once mentions a gun.
 "But today he came before you and mentioned that she pulled his gun on him because, I guess, she was upset at him. I'm not sure why. We can only speculate that. All we have is his testimony.
 "That's all we have here, but that goes to credibility in this case. And that's something that you people here get to decide, and I think that's crucial. I think it's very, very crucial when you assess what he's saying happened after he has had time to think about it and come up with an excuse or a reason or whatever you would want to call it.
 "The other factors is the wounds. 88 wounds. 88 at least 88 that Dr. Stewart stopped counting on. Now, he said that those wounds took place at least within a 24-hour period, some possibly at varying times. He can't be sure, but some of them were obviously at different times. How far apart he couldn't be exactly sure.
 "He also addressed there was wounds before or longer than a 24-hour period.
 "I think that's what it is telling us what the intent was here. If that isn't knowingly causing serious physical harm to someone, I don't know what is. I don't know how to explain it to you any better than that from what the evidence shows here and what the what the law will tell you that is.
 "When you go back there, I want you to deliberate using reasonableness and common sense. In no way is this a manslaughter. In no way, I submit to you, can you find this individual guilty of manslaughter. Now, why?
 "The Judge is going to instruct you what manslaughter is and and the instruction will have in it under a sudden fit of rage or a provocation occasioned by the victim, that would be Miss Dapice, reasonably sufficient to incite someone into using deadly force.
 "Now, his only admission to this was she pulled a gun at me out at me. I got it away, and he began beating her. I don't remember how many times, but at what point did he fear or was so provoked to beat someone like that? That's just not what the law is.
 "Even if you believe his scenario that she had a gun, even if you believe that, which I say that you can't based on the facts and based on what he told the police down here from Cleveland, this man was on a mission to kill her; and how do you know he was on a mission to kill her?
 "You known that he was angry about him possibly or Angela possibly fooling around with another man, that him getting out of being incarcerated and her taking his money, his drug scales, selling his truck, all the things that he admitted to.
 "Now, they want you to believe that, oh, he was happy. We're going to go to Niagra Falls and forget about all this; but right up until the day before he says this beating occurred that Monday, he's calling people telling all about what Angela did. Everything here according to Mr. Smith is Angela's fault.
 "That's what he wants you to believe. She was getting some money. She pulled the gun. She stole sold things of mine. It's all her fault. They want you to believe that. Give him provocation to put 88 wounds on her. That's just not what the evidence shows.
 "Use your reason and common sense. That's what I really want you to use in this case back there. You use it anywhere, you're supposed to use it as a juror; and that's really what I want you to use back there when you review the evidence `cause it's my belief that's all you really need to use."
In the above-quoted portion of the prosecutor's initial closing argument, the prosecutor argued that Smith's testimony concerning Dapice's having pointed a gun at him was not worthy of belief, and based that argument not upon the prosecutor's personal belief, but upon facts admitted in evidence at the trial. At one point, the prosecutor urges the jury to reject the manslaughter defense, even if they believe Smith's testimony that Dapice pointed a gun at him. But in so urging the jury, the prosecutor tells the jury that he is not suggesting that they should believe Smith that, to the contrary, they should not believe Smith, based on the facts, including Smith's having failed to mention anything about a gun in his initial statements to the police.
The prosecutorial statement that Smith asserts as reversible prosecutorial misconduct occurred during the final, rebuttal closing argument. That statement, in context, is as follows:
 "And after a person holds a gun on you and I don't believe the story. I think it's something he made up since he's been in custody. Someone puts a gun on you. You take it away from them. Then you start beating them within an inch of your life?"
In our view, the prosecutor's statement that he did not believe Smith's testimony, while improper, constituted nothing more than a reminder to the jury that, although the prosecutor was arguing that even Smith's testimony that Dapice pointed a gun at him taken at face value, would not support a manslaughter verdict, that did not mean that the prosecutor was conceding that Smith's testimony was true. The prosecutor was reminding the jury of the argument he had previously made, based on evidence in the case, that Smith's testimony was not worthy of belief.
We conclude that there is no reasonable possibility that the prosecutor's statement, quoted above, to the effect that he did not believe Smith's testimony, affected the outcome of this trial. Accordingly, even if Smith's trial counsel did object to this statement at trial, the trial court's failure to have sustained the objection and given the jury a cautionary instruction did not constitute prejudicial error requiring reversal of Smith's conviction.
Smith's second and fourth assignments of error are overruled, and his third assignment of error is overruled as moot, since even if the trial court had held a hearing on his motion to correct the record, and even if the record had been corrected to reflect the making of a contemporaneous objection to the prosecutor's remark, that would not have effected the outcome of Smith's trial, or this appeal.
 III
All of Smith's assignments of error having been overruled, the judgment of the trial court is affirmed.
WOLFF, P.J., and BROGAN, J., concur.