OPINION
{¶ 1} In four assignments of error, defendant-appellant Qaid Salaam claims that he was improperly convicted of felony murder, with a three-year gun specification.[1] For the reasons that follow, the arguments are without merit and his conviction is affirmed.
 Shootout Results in Death {¶ 2} On July 20, 2006, a shootout between Azizuddin Sanders and others resulted in the death of Sanders. Sanders was killed in the Walnut Hills area of Cincinnati.
 {¶ 3} Carin Allen was at the scene of the shooting and was injured by gunfire. She knew Immanuel Dubose, a codefendant of Salaam, because she had gone to high school with him. At trial, she testified that Dubose was at the scene of the shooting, but would not say that she had seen him participate in the shootout.
 {¶ 4} Antonio McBride also testified at trial. He was also a codefendant. He reached a plea agreement with the state, in this and other cases, in exchange for his testimony. He testified that he went to a party on the night of the shooting. Dubose and Salaam were also there. According to McBride, the three men decided to find Dubose's usual drug supplier and rob him. He said that he knew that both Salaam and Dubose were armed. He said that the three of them left the party to buy drugs.
 {¶ 5} The three men drove to Walnut Hills, but could not find Dubose's usual drug supplier. The group came upon another group of men that included Sanders. *Page 3 
According to McBride, Salaam had words with Sanders. When Sanders became "disrespectful," Salaam drew his weapon and pointed it at Sanders. Sanders raised his hands, but then ran into the street. Salaam began shooting at him. McBride said that he dove for cover and that he saw Dubose also begin shooting at Sanders. Sanders drew his own weapon and began shooting at Salaam and Dubose. Sanders was shot and died later at the hospital.
 {¶ 6} A witness at the scene identified a car that was seen leaving the location of the shooting. The investigation later indicated that the car was often borrowed by, among others, Dubose. Telephone records were admitted to connect the witness to Dubose on the night before and the night of the shooting. The owner of the vehicle remembered lending the car to Dubose around the time of the shooting.
 {¶ 7} Detective Keith Witherell testified that he was the lead detective in the case. He interviewed Allen on the night of the shooting, but she was only able to give a general description of the shooters. Cincinnati Police received five tips from the Crime-stoppers hotline, but determined that only one of them was credible. That call linked Dubose to the shooting. Allen was later shown a photo array that included Dubose's photograph, but she denied recognizing anyone.
 {¶ 8} Witherell stated that he later received a call from the victim's family, during which he was told that Allen had told them that she had recognized Dubose and that she was afraid to say anything because she lived and worked near the scene of the shooting. Witherell went to Allen's home and told her about the call he had received. According to his testimony, she admitted that she had initially lied about not recognizing Dubose because of her fear of retaliation. *Page 4 
 {¶ 9} Only Sanders's gun was found at the scene, but analysis indicated that three separate guns were involved in the shootout. No physical evidence was found linking either Dubose or Salaam to the shooting.
 {¶ 10} Salaam was indicted for aggravated murder, [2] murder, [3]
felony murder, [4] aggravated robbery, [5] and robbery.[6] Salaam was tried with Dubose. At the conclusion of the trial, the jury found him guilty only of felony murder, and he was sentenced accordingly.
 {¶ 11} On appeal, he has raised four assignments of error. For ease of analysis, we discuss the assignments of error out of order.
 Colon I, Colon II, and Felony Murder {¶ 12} In his fourth assignment of error, Salaam argues that since the indictment in this case failed to include a required mens rea element for the felony-murder charge, the indictment was defective and gave rise to structural error under the recent Ohio Supreme Court decision inState v. Colon.[7] We disagree.
 {¶ 13} The indictment in this case alleged that Salaam had "caused the death of AZIZUDDIN SANDERS as a proximate result of the defendant committing or attempting to commit an offense of violence, to wit: FELONIOUS ASSAULT, which is a felony of the Second Degree that is not a violation of 2903.03 or 2903.04 of the Revised Code, in violation of Section 2903.02(B) of the Ohio Revised Code * * *." *Page 5 
 {¶ 14} In State v. Colon (Colon I), the court concluded that an indictment that failed to state the mens rea of recklessly for robbery resulted in structural error.[8] That decision was clarified by the court in a subsequent decision (Colon II).[9] In that case, the court noted that "[i]n a defective-indictment case that does not result in multiple errors that are inextricably linked to the flawed indictment such as those that occurred in Colon I, structural-error analysis would not be appropriate. As we stated in Colon I, when a defendant fails to object to an indictment that is defective because the indictment did not include an essential element of the charged offense, a plain-error analysis is appropriate."[10]
 {¶ 15} In Colon II, the court noted that, in addition to the omission in the indictment, the proceedings suffered from the following defects: (1) there was no evidence to show that the defendant had notice that recklessness was an element of the crime of robbery; (2) there was no evidence that the state had argued that the defendant's conduct was reckless; (3) the trial court did not include recklessness as an element of the crime when it instructed the jury; and (4) the prosecuting attorney had treated robbery as a strict-liability offense in closing argument.[11]
 {¶ 16} Colon I noted that "the mental state of the offender is part of every criminal offense in Ohio, except those that plainly impose strict liability."[12] But felony murder is one of the few crimes in Ohio that has no mens rea element directly attached to it. The mens rea element is found in the predicate offense and does not arise from the *Page 6 
catchall culpable mental state of recklessly found in R.C. 2901.21(B). As the Ninth Appellate District recently noted, "a person commits felony murder pursuant to R.C. 2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying first or second degree felony offense of violence. In other words, the predicate offense contains the mens rea element of the felony murder."[13]
 {¶ 17} When the Ohio Supreme Court first addressed the then-new felony-murder statute, it concluded that, "[i]n reversing the felony murder conviction, the court of appeals critically misconstrued the standard of mens rea necessary to commit felony murder. Felonious assault is defined as knowingly causing, or attempting to cause, physical harm to another by means of a deadly weapon. * * * If defendant knowingly caused physical harm to his wife by firing the gun at her through a holster at close range, he is guilty of felonious assault. The fact that she died from her injuries makes him guilty of felony murder,regardless of his purpose."[14] The Tenth Appellate District likewise concluded that the "intent to kill is conclusively presumed as long as the state proves the required intent to commit the underlying felony * * *."[15]
 {¶ 18} So where, as here, felony murder is charged with a predicate offense of felonious assault, the state must prove that the defendant directly and proximately caused the death of another whileknowingly causing serious physical harm or *Page 7 
knowingly causing or attempting to cause physical harm by means of a deadly weapon or dangerous ordnance.[16]
 {¶ 19} In his brief, admittedly submitted prior to the release ofColon II, the only error Salaam cites is the absence of the mens rea element in the indictment. He does not assert (1) that he was unaware of the mens rea element for the charge against him, (2) that the state argued the incorrect mens rea, or (3) that the trial court improperly instructed the jury.
 {¶ 20} We have independently reviewed the record and conclude that none of these errors were present. First, the state correctly explained felony murder as follows: "Now this murder is going to sound different to you than the one we just talked about. There are different elements here, * * * but this one states that they caused the death, and you'll note you don't see the word `knowingly' or `purposefully' yet, as a proximate result of committing or attempting to commit an offense of violence, of felonious assault.
* * *
 {¶ 21} "If you can find there was a felonious assault, and the fact that there was a proximate death as a result of it, then you found Count 3 in the indictment. * * * Immanuel Dubose and Qaid Salaam, on July 20th, same date, time, and place, knowingly caused or attempted to cause physical harm to Azizuddin Sanders. Further states `by means of a deadly weapon,' or a handgun. * * * You are going to have to consider a different mental state here. And that mental state is `knowingly.' And did the defendants act knowingly when they pointed a gun at Mr. Sanders and fired. * * * *Page 8 
 {¶ 22} "They had an awareness of that probability, that firing a gun would or could inflict serious physical harm on Dean Sanders, when, in fact, that's exactly what happened. And once you make the finding here that there was a felonious assault and as a result of the felonious assault someone is now dead, then you find that the defendants committed the offense of murder as charged in Count 3 of the indictment."
 {¶ 23} Second, we note that the trial court improperly instructed the jury that felony murder required a showing that the "defendant purposefully caused the death of Azizuddin Sanders, as a proximate result of * * * committing or attempting to commit felonious assault." But adding the purposeful element only served to heighten the state's burden and inured to the benefit of Salaam.
 {¶ 24} After reviewing the record, we conclude that the failure to expressly include a mens rea element in the indictment for felony murder in this case did not lead to errors that "permeate[d] the trial from beginning to end and put into question the reliability of the trial court in serving its function as a vehicle for determination of guilt or innocence."[17] Therefore, pursuant to Colon II, any mistake in the indictment did not rise to the level of structural error. As required, we now examine any defect in the indictment on a plain-error basis.
 No Plain Error {¶ 25} Crim. R. 52(B) permits a reviewing court to take notice of "[p]lain errors or defects affecting substantial rights" even if a party forfeits an error by failing to object to the error at trial.[18] To correct a plain error, (1) there must be an *Page 9 
error, i.e., a deviation from a legal rule; (2) the error must be plain, i.e., an "obvious" defect in the trial proceedings; and (3) the error must have affected substantial rights to the extent that it affected the outcome of the trial.[19] Courts are to take notice of plain error "only to prevent a manifest miscarriage of justice."[20]
 {¶ 26} We cannot conclude that any omission in the indictment was a plain or obvious defect in the trial proceedings. Since felony murder takes its mens rea element from the predicate offense, the indictment would have only been faulty if the failure to list the elements of the predicate offense rendered it so.
 {¶ 27} In State v. Childs, the foundational decision for the holding in Colon I regarding the constitutional requirements of an indictment, the defendant was charged with conspiracy relating to drug trafficking.[21] But the indictment that charged the conspiracy count did not name the drug that was the object of the conspiracy.[22] After discussing the constitutional requirements of an indictment-later quoted by the Colon I majority — the Childs court concluded that "[w]here the offense at issue is charged as a conspiracy, it is well established that it is the elements of the conspiracy that must be provided: Conspiring to commit a crime is an offense wholly separate from the crime, which is the object of the conspiracy. Thus, we have consistently held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit."[23] *Page 10 
 {¶ 28} The court later amplified its position in State v.Buehner,[24] stating that, in the context of ethnic intimidation,"it is the predicate offense itself and not the elements of the predicate offense that is an essential element of the chargedoffense."[25] In Buehner, the court noted that it had "previously rejected the argument that an indictment is defective for the state's failure to identify the elements of the underlying offense of the charged crime."[26] The Buehner court held that "[a]n indictment that tracks the language of the charged offense and identifies a predicate offense by reference to the statute number need not also include each element of the predicate offense in the indictment."
 {¶ 29} In this case, the indictment did not indicate the predicate offense by statute number, but by the name of the offense: felonious assault. The question we must then answer is whether this distinction is meaningful. It is not.
 {¶ 30} Since the statute number was present in Buehner, it was not necessary for the court to consider whether another form of reference — such as reference to the offense by name — would have been sufficient. The court did note that the "purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same offense."[27] The court also noted that "an indictment `may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in *Page 11 words sufficient to give the defendant notice of all the elements of theoffense with which the defendant is charged.' "[28] Given this language, one could read Buehner for the proposition that "words sufficient to give the defendant notice" include reference to the Revised Code by the name of the offense rather than by the section number. This court fails to see any meaningful difference between an indictment that says "R.C. 2903.11" and one that says "felonious assault."
 {¶ 31} Since naming the predicate offense is sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged, it follows that the omission complained of in this case was not a plain or obvious defect in the trial proceedings. While it would have been better either to have listed the section number for felonious assault in the indictment, bringing this case into literal compliance with Buehner, or to have charged felonious assault separately, [29] the failure to do either did not render the indictment invalid.
 {¶ 32} But even if we were to conclude that the failure to list the mens rea element was error, and that this error was plain, the record does not support the conclusion that it affected Salaam's substantial rights to the extent that it affected the outcome of the trial. The prosecution properly argued what it had to prove to establish that Salaam had committed felony murder. And while the trial court improperly instructed the jury that the state had the additional burden of proving a purposeful killing, this mistake benefitted Salaam. On this record, we cannot *Page 12 
conclude that the outcome of the trial would have been different had the indictment included a mens rea element.
 {¶ 33} Salaam's fourth assignment of error is overruled.
 State's Impeachment of Allen {¶ 34} In his first assignment of error, Salaam claims that the trial court abused its discretion when it allowed the state to impeach its own witness with her prior statement without showing surprise and affirmative damage. We disagree.
 {¶ 35} Allen's testimony related only to Dubose and did not implicate Salaam at all. In fact, throughout the proceedings, Allen denied knowing Salaam or having seen him at the scene of the shooting. Therefore, any possible error in allowing the state to impeach Allen could not have prejudiced Salaam. Even if some prejudice could be shown, we reject this argument for the reasons set forth in our opinion in State v.Dubose.[30]
 {¶ 36} Salaam's first assignment of error is overruled.
 Sufficiency and Weight of the Evidence {¶ 37} In his second assignment of error, Salaam claims that the conviction was against the manifest weight of the evidence. In his third assignment of error, he claims that his conviction was based upon insufficient evidence. We disagree.
 {¶ 38} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable *Page 13 
doubt.[31] In a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[32]
 {¶ 39} The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of fact to resolve.[33]
"Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. "[34]
 {¶ 40} "It is the State's burden at trial to prove the criminal charge or charges alleged beyond a reasonable doubt. However, when a convicted defendant argues on appeal that his conviction is against the manifest weight of the evidence, the defendant bears the burden of that proposition. He must show that his conviction is contrary to the weight of the evidence offered, not merely that the probative value of the evidence offered by both sides is in equipoise. In that circumstance, this court will not substitute its judgment for that of the trier of facts on issues such as witness credibility, unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. "[35]
 {¶ 41} In this case, McBride testified about the plan that he, Salaam, and Dubose had concocted and about how the encounter had proceeded. His version of *Page 14 
events matched the physical evidence found at the crime scene. The jury was fully informed of McBride's plea agreement with the state and was instructed about the problems that might be inherent in the testimony of a co-conspirator.
 {¶ 42} A rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt, and the jury did not lose its way by doing so in this case.
 {¶ 43} Salaam's second and third assignments of error are overruled.
 Conclusion {¶ 44} For the foregoing reasons, we overrule Salaam's four assignments of error and affirm the judgment of the trial court.
Judgment affirmed. SUNDERMANN, P.J., and HENDON, J., concur.
[1] R.C. 2903.02(B).
[2] R.C. 2903.01(B).
[3] R.C. 2903.02(A).
[4] R.C. 2903.02(B).
[5] R.C. 2911.01(A)(1).
[6] R.C. 2911.02(A)(2).
[7] 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917.
[8] Id. at 19.
[9] State v. Colon, 2008-Ohio-3749.
[10] Id. at ¶ 7, citing Colon, 118 Ohio St. 3d 26, 2008-Ohio-1624,885 N.E.2d 917, at ¶ 23.
[11] Id. at ¶ 6.
[12] Colon I at ¶ 11, citing State v. Lozier, 101 Ohio St.3d 161,2004-Ohio-732, 803 N.E.2d 770, at ¶ 18.
[13] State v. Sandoval, 9th Dist. No. 07CA009276, 2008-Ohio-4402, at ¶ 21.
[14] State v. Miller, 96 Ohio St.3d 384, 2002-Ohio-4931,775 N.E.2d 498, at ¶¶ 31, 33.
[15] State v. Walters, 10th Dist. No 06AP-693, 2007-Ohio-5554, at ¶ 61.
[16] See R.C. 2903.02(B) and 2903.11.
[17] Colon I, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, at ¶ 17.
[18] State v. Payne, 114 Ohio St.3d 502, 2007-Ohio-4642,873 N.E.2d 306, at ¶ 5, quoting Crim. R. 52(B).
[19] State v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68,759 N.E.2d 1240.
[20] Payne at ¶ 16, quoting State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph three of the syllabus.
[21] State v. Childs, 88 Ohio St.3d 558, 2000-Ohio-425,728 N.E.2d 379.
[22] Id.
[23] Childs, 88 Ohio St.3d at 565.
[24] 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162.
[25] Id. at ¶ 12 (emphasis added).
[26] Id. at ¶ 10, citing State v. Murphy (1992), 65 Ohio St.3d 554,583, 605 N.E.2d 884.
[27] Buehner at ¶ 7.
[28] Buehner at ¶ 8, quoting Crim. R. 7(B).
[29] See Sandoval at ¶ 23 (omission of mens rea element in felony-murder indictment cured because the defendant was also separately indicted for he underlying felonious assault).
[30] (Sept. 30, 2008), 1st Dist. No. C-070397, at ¶¶ 48-63.
[31] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[32] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[33] State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212.
[34] State v. Lawson (Aug. 22, 1997), 2nd Dist. No. 16288.
[35] State v. Foust, 2nd Dist. No. 20470, 2005-Ohio-440, at ¶ 28. *Page 1